## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AMINA MADDOX,** | Civ. No. 2:10-5025 |
| **Plaintiff,** | (KM)(MCA) |
| **v.** | |
| **CITY OF NEWARK, et al.,** | **OPINION** |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes before the Court on the motion of Defendant Ivan Whittenburg (ECF No. 61) and the motion of Defendants City of Newark, Julien Neals, and Anna Pereira (ECF No. 62) for summary judgment. The Complaint, filed by the Plaintiff, Amina Maddox, essentially alleges that she was fired from her position as Assistant Corporate Counsel for the City of Newark on a discriminatory basis. For the reasons set forth below, Defendants' motions are **GRANTED**.

### I.    INTRODUCTION

The dueling factual allegations in this employment discrimination case are complex and intricate, although not all of the contested facts are relevant. To highlight the central issues, I offer some general discussion at the outset.

Discriminatory termination cases, when they fail, can do so at any one of several junctures. The employee may not have suffered as a result of occupying a protected status (such as race or religion), or engaging in protected activity (such as First Amendment expression). For example, an allegation of a hostile work environment may fail because the evidence shows only isolated incidents, however objectionable. Having passed that hurdle, the employee may fail to demonstrate that an act of discrimination played the necessary causal role in her firing. Consider, for example, a case in which the person who heard a protected complaint or voiced discriminatory sentiments did not participate in the termination decision. The employee would then be relegated to some other, less direct theory of proximate cause. Finally, and relatedly, the employer may

1

meet its burden of establishing that the stated, valid reason for termination was genuine, and not a pretext for discrimination.

Maddox, an assistant corporate counsel for the City of Newark, was fired in January 2009. Her primary claim here is based on a September 2007 incident in which a supervisor, Whittenburg, made remarks that were offensive to a Muslim co-worker, Safdar.[1] Maddox says she was fired because she spoke out about the incident. Her evidence shows that Safdar reported the incident to a supervisor, apparently without any repercussions. Maddox herself merely answered a supervisor's questions, and reluctantly at that.

Whittenburg allegedly retaliated against Maddox, however, by assigning her an unfair share of work. After she complained about her workload, there was a supervisory review of her files. All employees were admittedly subjected to such a file review; Maddox's claim of discrimination is that her review was moved up to the earliest group. What that review uncovered was neglect of duty, including the failure to process checks received from the bankruptcy court. It was for that and other stated reasons that she was dismissed in January 2009.

Whittenburg played no part in the Corporation Counsel's decision to fire Maddox. To connect the September 2007 Safdar incident to her January 2009 dismissal, Maddox resorts to less direct theories of causation, centered around the 2008 review of her files. She complains of discrimination *via* overwork, but submits no evidence of other employees' workloads from which discrimination or unfairness could be inferred. She complains of being placed in the first group of file reviews, but does not state why that was impermissible or demonstrate that the timing of her review prejudiced her. Causation cannot here be inferred from temporal proximity; the file review occurred over a year after the September 2007 Safdar incident, and her dismissal three months after that. In short, the file review, early or late, does not establish a proximate-cause link between the Safdar incident and Maddox's dismissal.

The City submits persuasive evidence of a neutral reason for Maddox's dismissal: substandard job performance, including absenteeism, uncashed checks in case files for which Maddox was responsible, and failure to make court filings. In response, Maddox offers argumentation, but no evidence, that those concerns were pretextual.

---

[1]   Other claims of discrimination or retaliation are discussed in the body of this opinion.

The statutes that Maddox cites do not protect employees from actions that are harsh, unwise, or even mistaken. What is required is a showing that her dismissal was unlawfully discriminatory or retaliatory. She has not made such a showing.

## II. BACKGROUND[2]

Amina Maddox brought this wrongful termination case against her former employer, the City of Newark ("Newark") and several supervisory employees in the Corporation Counsel's Office where she worked: Julian Neals (former Corporation Counsel), Anna Pereira (former First Assistant Corporation Counsel), and Ivan Whittenburg (Real Estate Section Chief).

### A. Parties

Maddox worked as an Assistant Corporation Counsel for the City of Newark from 2007 to 2009. DSMF ¶¶ 2, 94. She is African-American and a practicing Christian.[3] *Id.* ¶¶ 7-8. Maddox was admitted to the Bar of the State of New Jersey in January of 1998. DSMF ¶ 1 (citing Ex. A, Pl. CV). She clerked for Hon. Rosemary Gambardella, the former Chief Judge of the United States Bankruptcy Court for the District of New Jersey. *Id.* ¶ 4. From April 1999 to May 2007, Maddox worked on bankruptcy matters as a Deputy Attorney General for the State of New Jersey. *Id.* ¶ 3.

Neals was the City's Corporation Counsel from February 1, 2008, to November 15, 2010. *Id.* ¶ 11. Pereira, Neals's successor as Corporation Counsel, served as First Assistant Corporation Counsel from September 22, 2008, to November 15, 2008. *Id.* ¶ 12. Whittenburg was hired as an Assistant Corporation Counsel on March 12, 2007. *Id.* ¶ 18. He became the Assistant Section Chief of the Real Estate Section on July 2, 2007, and the Section Chief

---

[2]    The City Defendants' Joint Statement of Material Facts is cited as "DSMF" and Plaintiff Maddox's Responsive Statement of Material Facts as "RSMF".

Lettered exhibits cited in connection with the DSMF are attached to the certifications of Mr. D'Anton, submitted on behalf of the City Defendants. (ECF Nos. 62, 70). Numbered exhibits cited in connection with the RSMF are attached to the certification of Mr. Roberts, submitted on behalf of Plaintiff Maddox. (ECF Nos. 64, 65). There are also numbered exhibits attached to the certifications of Mr. Carmagnola, submitted on behalf of Defendant Whittenburg. (ECF Nos. 61, 72).

[3]    In her responding papers, Maddox asserted for the first time that she was also raised in the Muslim faith and now subscribes to "facets of both religions." RSMF ¶ 8. She does not cite any evidence suggesting that anyone at her workplace was aware of that background.

on September 1, 2007. He held that position until the Real Estate Section was eliminated in 2010. At the time of the filing of this motion, he served as Assistant Corporation Counsel in the Litigation Section. *Id.* ¶¶ 18-20. All of the individual Defendants had supervisory authority over Maddox in the Law Department.

### B. Facts of the Case

Newark hired Maddox as an Assistant Corporation Counsel on June 4, 2007. *Id.* ¶¶ 2, 6. (citing Ex. B, Pl. Performance Eval; Ex. D, Pl. Offer of Employment). Defendants posit that Maddox was hired because of her experience in bankruptcy law.[4] *Id.* ¶ 24. Maddox was expected to take over Newark's bankruptcy cases from Ayesha Freeman, the Section Chief of the Real Estate Section, who was about to retire. *Id.* ¶¶ 17, 25 (citing Ex. G, Pl. Tasks and Standards).

Maddox asserts that she was employed pursuant to a collective bargaining agreement between AFL-CIO Local 103 and Newark, and could only be terminated for good cause. RSMF ¶ 5. Defendants assert that Maddox was hired as an at-will employee and did not have tenure. DSMF ¶ 5 (citing Ex. C, Newark Ordinances Ch. 6). Section 2:6-5.1 of the Newark Ordinances states that assistant corporation counsel and other Law Department staff serve "at the pleasure of the Corporation Counsel." Ex. C.

#### 1. Work Load and Performance

Maddox and the Defendants disagree as to various issues regarding her work load and performance. Maddox asserts that Defendant Whittenburg unfairly distributed work assignments to her. RSMF ¶ 67. Defendants assert that Maddox was assigned cases based on her areas of expertise: bankruptcy and real estate. DSMF ¶ 67 (citing Ex. N, Foster Memos to File; Ex. O, Whittenburg Dep.); DSMF ¶ 29 (citing Chandy Cert.). Maddox says that she was "never told" that she was the bankruptcy attorney for Newark until November 2008. RSMF ¶ 35. There is no dispute, however, that she was assigned to a large real estate foreclosure project and then was responsible for a number of bankruptcy files.

---

[4]     Maddox clerked for the chief judge of the bankruptcy court in this district. She asserts, however, that she was not hired for bankruptcy work, but to fill an opening in the real estate section. RSMF ¶ 25. Although the parties make much of this issue, I have seen nothing to suggest that lawyers in the corporation counsel's office could not permissibly be assigned to whatever matters required attention.

4

Maddox had the "ultimate responsibility" for handling cases assigned to her. DSMF ¶ 28; RSMF ¶ 28. That included drafting answers, interrogatories, correspondence and pleadings; reviewing correspondence; and representing Newark's interests by resolving the cases she was assigned. DSMF ¶ 28.

Maddox was initially assigned as the lead attorney in charge of the in rem foreclosure project. *Id.* ¶ 26. Maddox received assistance from other attorneys and paralegals in the Real Estate Section, and from Newark tax collector Michelle Jones. *Id.* ¶¶ 32, 33, 34; RSMF ¶ 34. In the course of completing that project, she reviewed title binders and sent out notices. DSMF ¶ 27.

Maddox asserts that she had the heaviest case load in the Law Department and that the bankruptcy matters assigned to her were "much more than a heavy lift." *Id.* ¶¶ 37, 40 (citing Ex. 8 at 19). Defendants disagree. They point out that Newark was invariably a creditor; the cases involved filing a simple proof of claim and waiting until the matter was resolved by the issuance of a check. *Id.* ¶ 38. The cases rarely involved an in-court appearance. *Id.* ¶ 39; *see also* Ex. GG, Johnson Dep. at 40-41. Maddox's paralegal, Jones, testified that Maddox had a huge stack of files. Jones also stated, however, that she, the paralegal, did the "bulk" of the bankruptcy work. Defendants attest that other employees in the Law Department, including Mazzula and David Torres, had workloads equal to or heavier than Maddox's. DSMF ¶¶ 41-42. Maddox does not document the workload of other employees who allegedly had less work than she did.

Defendants assert that Maddox generally "did not do a lot of work." DSMF ¶ 58. She was frequently "in the hall," on her cell phone, or chatting with other people. *Id.* ¶¶ 55-57. Maddox denies these assertions. RSMF ¶¶ 55-57 (without citation). Over 10,000 pages of personal e-mails, some inappropriate for the workplace, were recovered from Maddox's city-owned computer.[5] DSMF ¶¶ 86-90 (citing Ex. V, Maddox 8 and 9; Ex. H, Maddox Dep. at 256-57, Ex. W). When confronted about neglecting her duties, Maddox stated that it was "not her fault." *Id.* ¶ 59. Whittenburg, she claimed, prevented her from completing her work because he would "sit on files, sit on complaints before distributing to the attorneys in his section and forc[e] people to do things at the last second." RSMF ¶ 59 (citing Ex. 9, Nance Dep. at 69).

---

[5]    Maddox stated that she did not possess sufficient information to admit or deny whether Newark obtained the emails. RSMF ¶¶ 86-87. She admits to their content, as discussed further below. *Id.* ¶¶ 88-89.

5

Defendants assert that Maddox challenged authority. *Id.* ¶ 60. Maddox denies that. RSMF ¶¶ 60-62.

Marquis D. Jones, the First Assistant Corporation Counsel from June 2006 to December 2007,[6] stated that he had issues with Maddox's work ethic. DSMF ¶¶ 15, 61. Jones discussed terminating her with Chandy and Torok, who were "protective" of Maddox. *Id.* ¶ 62.

### 2. Promotion

Aney Chandy was Corporation Counsel from July 1 2006 to February 1, 2008. *Id.* ¶ 14. Maddox says that Chandy told her that she would likely be promoted to Assistant Section Chief. RSMF ¶ 63 (citing Ex. 3, Maddox Dep.). Defendants respond that Chandy never promised Maddox a promotion to Assistant Section Chief. DSMF ¶¶ 30, 31. In their version, Maddox began asking for a promotion soon after she was hired. *Id.* ¶¶ *Id.* ¶ 63, 64 (citing Chandy Cert.). Chandy told her: "You just got here. Do your job. The discussion is premature." *Id.* ¶ 65 (citing Chandy Cert.).

### 3. Late Arrivals and Absences

Maddox states that she worked late each day, but her payroll records do not support that statement. DSMF ¶ 83 (citing Ex. I, Time Sheets). Maddox claims that she always worked more than the required 37.5 hours a week, but that assertion is likewise unsupported by her payroll records. *Id.* ¶ 84. Defendants assert that Maddox arrived late for work daily. *Id.* ¶ 54. They add that Maddox used sick leave frequently, and had a history of excessive sick leave use dating back to her time at the Attorney General's Office. *Id.* ¶¶ 43 (citing Ex. I), 45 (citing Ex. K, Pl. Sick Leave Records). Maddox exceeded her allotted sick and vacation days for 2007 and 2008.[7] *Id.* ¶ 46 (citing Ex. L, Pl. Requests for Sick Leave). Maddox's sick days, say Defendants, frequently occurred on the dates of scheduled court appearances. *Id.* ¶ 47 (citing Ex. M, Internal Emails and Memoranda). Even when asked, Maddox allegedly would not notify the Court or her adversary that she would not be attending. *Id.* ¶ 53.

In explanation, Maddox asserts that she has a chronic medical condition. RSMF ¶¶ 43, 54. She never provided adequate proof of such a condition when it was requested during the course of her employment, in discovery, at her deposition, and through written requests to her counsel. DSMF ¶ 44. Maddox

---

[6]     Jones is currently a New Jersey Superior Court Judge.

[7]     Maddox disputes this assertion but does not cite to the record. RSMF ¶ 46.

asserts that she provided Newark with copies of medical notes. RSMF ¶ 44 (citing Ex. 15, Medical Records). Those medical records, however, do not document any serious or chronic condition. They contain prescriptions, records of ordinary doctor and dental appointments, and emails from Maddox to the office indicating that she was recovering from a cold. Ex. 15.

Maddox told Angela Foster, the Chief of Staff for the City's Law Department, that she suffered from bronchitis. Ex. J, Foster Memo to File and Emails. Maddox requested a 10:00 am start time as an accommodation to her "chronic" medical condition. RSMF ¶ 48. Newark agreed to the accommodation on the condition that Maddox document her ailment with a physician's note. Maddox replied that she would not provide the note because of HIPAA regulations. *Id.* DSMF ¶ 48 (citing Ex. J); ¶ 49 (citing Ex. H, Maddox Dep.).

Maddox says she requested the necessary form to apply for a reasonable accommodation but that Angela Foster failed to furnish it. DSMF ¶¶ 16, 50; RSMF ¶¶ 48, 50-51. She admitted at her deposition that she was not sure if the City even had such a form, but that she assumed it did. *Id.* ¶ 50. (citing Ex. H at 835:1-20). She also stated at her deposition that she had no evidence that Whittenburg had any input into whether she received flexible hours because she did not broach the subject with him. *Id.* ¶ 52 (citing Ex. H at 498-99).

Maddox claims that other employees came in late but were not disciplined. RSMF ¶ 48. For instance, Neals did not discipline another attorney who arrived late because of traffic issues. RSMF ¶ 54. She points to Neals's testimony that he allowed for some flexibility as long as the attorneys worked for 37.5 hours per week. *Id.* (citing Ex. 1, Neals Dep. at 104-05). Neals's statement, in context, was that there was flexibility "on the day-to-day basis" but that "there was an expectation that generally you would be in by 9:00 or some reasonable time because city business was starting, and we're a law office for all intents and purposes." Ex. 1 at 104.

### 4. Review of Maddox's Cases

Maddox asserts that she received an "unfair" case load because Whittenburg was trying to "bury" her. RSMF ¶ 67. Maddox's complaints that she was "inundated" with work prompted (or at least were followed by) a review of her files by Pereira and Danielle Torok. *Id.* ¶¶ 66, 68, 69 (citing Ex. E, Complaint; Ex. N, Foster Memos to File); RSMF ¶ 66 (admitting in part, but stating that Defendants had already decided to review all of the attorneys' files).

The file review commenced at the end of October 2008. *Id.* ¶ 69. Maddox states that she worked with Pereira and Torok[8] on the file review. That is not reflected in her time sheets. *Id.* ¶ 71 (citing Ex. R, Pereira Dep. at 30-32); RSMF ¶ 71.

The other attorneys in the Newark law department went through the same file review process. *Id.* ¶ 77 (citing Ex. R at 16-17). Maddox admits that all attorneys' files, not just hers, were reviewed. Her complaint is that she was not initially scheduled to be in the first group of reviews, but that her review was moved to an earlier date in "retaliation."[9] She also asserts that Defendants told her and paralegal Kelly Johnson that the purpose of the review was to clear out old files. *Id.* ¶ 68.

Defendants assert that it was during this review that they became aware of the "depth and breadth of Maddox's nonfeasance." DSMF ¶ 70. The review revealed that the files contained uncashed bankruptcy trust checks that had not been submitted to the appropriate City department for processing. *Id.* ¶ 73. (citing Ex. R at 27-29, 33). Maddox responds that she kept a list of all the checks that came in and that she instructed paralegal Johnson where to forward the check. RSMF ¶ 70 (citing Ex. 8, Johnson Dep. at 39-40). She also asserts that the reviewed files included ones that she inherited from predecessors, and that some of the checks dated from 2005 and 2006. *Id.* ¶ 73 (citing Ex. 1 at 110, 111-18). Pereira testified that she did not fault Maddox for the oldest checks' having become stale in the first place, but only for failing to take action on them. Ex. R at 29.

The review revealed that Maddox had failed to file proofs of claim in her bankruptcy cases, and that she had not filed responsive pleadings in numerous foreclosure actions. DSMF ¶¶ 74, 75 (citing Ex. R, Pereira Dep. at 27-33). Maddox says she denies these assertions, but cites no evidence. RSMF ¶¶ 74, 75 (without citation). Maddox acknowledged at her deposition that failure to file a required answer would constitute malpractice and grounds for termination. *Id.* ¶ 76 (citing Ex. H, Maddox Dep. at 778-79).

---

[8]   Pereira, Corporation Counsel now and at the time the Complaint was filed, served as First Assistant from September 22, 2008 to November 15, 2010. *Id.* ¶ 12. Torok was First Assistant from July 3, 2006 until February 17, 2012. *Id.* ¶ 13.

[9]   There is some ambiguity about whether the alleged "retaliation" was for her complaints about her workload, for speaking about the Safdar incident, or both. *See* RSMF ¶¶ 66, 77. Defendants state that the review was held in response to, not in retaliation for, Maddox's complaints about her workload; at any rate, complaints about workload do not in themselves implicate the protections of the antidiscrimination laws.

From their review of Maddox's files, Pereira and Torok concluded that she had a high volume of cases, but that these files primarily required clerical, rather than substantive, attention. DSMF ¶ 79 (citing Ex. R at 13). Pereira and Torok closed some of the cases, leaving Maddox with a smaller case load. *Id.* ¶ 80 (citing Ex. R at 30-34). Whittenburg also reassigned a number of matters. *Id.* ¶ 81 (citing Ex. S, Law Dept. Records). Again, Maddox generally denies this, but the reassignments are documented. *Id.*

During the review, Maddox was on a vacation in Brazil, and called in sick the day she was scheduled to return. (Defendants say it was a 12 day vacation; Maddox says it was for "fewer days." RSMF ¶ 78. After the file review, Defendants assert, Maddox continued to fail to transmit trustee checks to the applicable Newark department. DSMF ¶ 82 (citing Ex. T, Uncashed Checks). The uncashed checks submitted by Defendants are dated November and December 2008. *Id.* Maddox again generally denies or excuses this neglect, but cites no relevant evidence. RSMF ¶ 82 (reiterating that she had a larger case load than the other attorneys and that it was the job of Johnson, the paralegal, to keep track of the checks).

5. Personal Use of Work Computer

Defendants assert that Maddox used her city-owned computer for personal emails, many of which were not appropriate. Defendants produced over 10,000 pages of personal emails collected from Maddox's work computer; the emails included photographs of gang members, sexually provocative photographs, and the use of racial epithets. *Id.* ¶¶ 87, 89. Maddox does not dispute the content of the emails but asserts that the inappropriate comments were made by others. RSMF ¶ 89. Maddox also sent numerous emails to her friends and coworkers regarding personal matters like vacations, her involvement with the 2008 presidential campaign, her romantic life, dinner and movie plans, after-work events, news articles, and religious email chains. DSMF ¶ 90; *see also* RSMF ¶ 90 (stating that Maddox did not have "sufficient information" to admit or deny the assertion).

At her deposition, Maddox testified that the multitude of personal emails did not change the fact that she was overworked, stating "Obama responds to personal e-mails during his work time, but he is still overworked." Ex. H at 256-57. Maddox also testified that it was permissible for her to use racially insensitive remarks about African-Americans in her emails because certain terms were often used 'internally" to "describe a certain type of black person." *Id.* ¶ 91 (citing Ex. H at 246-47).

It does not appear that the emails, which the City had not read at the time, were cited contemporaneously as grounds for dismissal.

### 6. Maddox's Termination

Newark terminated Maddox on January 23, 2009. *Id.* ¶ 94 (citing Ex. X, Resp. to Pl. Grievance). Julian Neals, as Corporation Counsel, made the decision. *Id.* ¶ 95 (citing Ex. Y, Neals Dep. at 128). At Neals's direction, Angela Foster, the Chief of Staff of the law department, notified Maddox that she had been terminated. *Id.* ¶ 96 (citing Ex. R at 44).

Whittenburg was not involved in the decision, and did not have the authority to terminate Maddox. DSMF ¶¶ 97, 98 (citing Ex. C; Ex. R at 67). Whittenburg did not learn of Maddox's firing until after it had occurred. *Id.* ¶ 99 (citing Ex. O at 141-42). Maddox admits that Whittenburg did not terminate her, but contends that Whittenburg's discriminatory, retaliatory conduct sabotaged her employment. RSMF ¶ 97.

Defendants assert that Maddox's termination resulted from a number of factors, including her failure to meet her duties, obligations and ethical responsibilities; her failure to properly manage her bankruptcy and foreclosure files; and her time and attendance records. *Id.* ¶ 100 (citing Ex. X). The bankruptcy and foreclosure files, Defendants say, were not properly maintained and needed to be brought up to date; responsive pleadings were not filed in foreclosure cases; bankruptcy files that should have been closed remained open; file correspondence accumulated for 60-90 days with no action taken; and proofs of claim were not filed when the amount of money due the City would have justified it. Even after supervisors raised with Maddox the issue of unprocessed checks, the checks continued to accumulate and were not handled on a timely basis. *Id.* ¶ 101 (citing Ex. X). Defendants also assert that five boxes of files, some of which contained outdated trustee checks, had to be sent to the Tax Collector's office to determine the appropriate disposition. *Id.* Numerous outdated trustee checks for the payment of taxes or sewer charges had to be returned to the Bankruptcy Trustee. *Id.* Defendants claim that the issues with the bankruptcy and foreclosure files exposed Newark and debtors to potential liability. *Id.* ¶ 102 (citing Ex. R at 38-41).

The Newark Defendants submit a certification from Marie-Ann Greenberg, the Chapter 13 Standing Trustee for the United States Bankruptcy

Court, that supports their proffered explanation for Maddox's termination.[10] In September 2008, Greenberg advised the law department that there were several checks drawn to the order of Newark that were either outstanding or that had been cancelled. DSMF ¶ 117 (citing Greenberg Cert. (ECF No. 62-9) ¶ 3). Greenberg stated that if she did not receive a response, the funds would be sent to the Bankruptcy Court's Registry and the funds would only be released to the City after an application and responsive Order. *Id.* ¶ 118 (citing Greenberg Cert. ¶ 4). Greenberg opined that the attorney assigned to the bankruptcy cases at that time "did a terrible and careless job" of handling the cases. *Id.* ¶ 120 (citing Greenberg Cert. ¶ 5). Homeowners were being penalized because the checks had not been cashed. *Id.* ¶ 122 (citing Greenberg Cert. ¶ 7). Greenberg met with Corporation Counsel to resolve the issues; she believed that the assistant Corporation Counsel that took over for Maddox did an "outstanding job" rectifying the check problem. *Id.* ¶ 124 (citing Greenberg Cert. ¶¶ 8-9).

Maddox disputes the given reasons for her dismissal. She posits that Whittenburg sabotaged her employment by assigning too many files to her. RSMF ¶ 97. She asserts that she received a favorable evaluation (by Whittenburg) in September 2007 that stated she was a "great resource" and had done an "excellent job" administering the foreclosure project. RSMF ¶ 120 (citing Ex. 13, Pl. Eval.). She also asserts that she was protected by the collective bargaining agreement and could only be terminated for good cause (discussed in more detail *infra*). *Id.* ¶¶ 104, 108. She asserts that Newark replaced her with two white, male attorneys who did not have any bankruptcy experience. RSMF ¶ 67.

### 7. Collective Bargaining Agreement & Newark Personnel Policy

The Collective Bargaining Agreement ("CBA") between Newark and the union representing assistant corporation counsel establishes management rights to hire, assign, promote, suspend, demote, discharge, and take disciplinary action and notes that "no disciplinary grievances are subject to arbitration." DSMF ¶¶ 103, 114 (citing Ex. Z). Defendants assert that Maddox was afforded all of her rights under the CBA. *Id.* ¶ 104. Maddox was an unclassified employee, not subject to the Merit System Rules and regulations. *Id.* ¶ 109 (citing Ex. CC, Exceptions from Merit System Rules). Unclassified

---

[10]   Maddox denies the veracity of the statements made in the Certification. RSMF ¶¶ 117-120. The issue, however, is whether the City was entitled to, and did, take action based on it (as opposed to using it as a pretext for discrimination).

Newark employees are not considered permanent employees. *Id.* ¶ 110 (citing Ex. C).

In addition to her rights under the CBA, Maddox testified that the Newark Department of Personnel Manual afforded Newark employees, including her, with the right to progressive discipline. *Id.* ¶ 112 (citing Ex. H at 808-09); RSMF ¶ 104. Those steps included (1) a corrective conference, and (2) a written reprimand. RSMF ¶ 104 (citing Ex. 4, Newark Personnel Operating Policies and Procedures, at 3). The personnel manual states that progressive discipline applies to "employees with permanent status." Ex. 4. Defendants assert that Maddox was not entitled to progressive discipline because employees are not afforded the right to progressive discipline under the CBA and Maddox was not a "permanent employee" protected by the personnel policy. DSMF ¶¶ 108, 109 (citing Ex. Z, CBA; Ex. CC). Therefore, any policy that may have provided for progressive discipline for other employees did not apply to Maddox. DSMF ¶ 111 (citing Ex. DD, Newark Personnel Operating Policies and Procedures).

### 8. Allegations related to Discrimination

#### a. *Worker's Compensation*

Maddox asserts that Defendants retaliated against her for filing a worker's compensation claim after an accident at work. Maddox filed a workers' compensation claim petition on March 9, 2012, months after her firing, although she claims to have given notice beforehand. *Id.* ¶ 105 (citing Ex. AA). On February 5, 2013, Maddox settled her case for $9,000.00 pursuant to N.J.S.A. 34:15-20. *Id.* ¶ 106 (citing Ex. BB).

#### b. *Allegations Against Defendant Whittenburg*

Most of Maddox's allegations of discriminatory conduct concern Defendant Whittenburg. Maddox testified at her deposition that when she first started in the Law Department, they socialized and she "had no problem" with him. Ex. H at 648-49. Their relationship soured, she says, after Whittenburg made discriminatory comments to another lawyer in her department, Saleem Safdar. Maddox claims that she was retaliated against for reporting the comments to management.

Both Safdar and Whittenburg were supervised by First Assistant Marquis Jones. DSMF ¶ 125. Maddox asserts that Whittenburg demonstrated "dislike" towards Safdar because of his Muslim heritage. RSMF ¶ 18. Maddox (who did not witness the conversation, Ex. H at 79-80) claims that Whittenburg referred

to visiting Jerusalem and stated that, if approached aggressively, he would "blow the head off a Pakistani kid." She "may" have witnessed a conversation in which Whittenburg insensitively questioned Safdar about his religion. *Id.* (citing Ex. 6, Mazzula Dep. at 81-82;[11] Ex. 3, Maddox Dep. at 147-49). Referring to Ramadan, a holiday that requires the faithful to fast, Whittenburg allegedly asked Safdar "What is it you guys do? Why don't you eat?" *Id.* ¶ 127 (citing Ex. 3 at 23-25). Maddox also alleges that Whittenburg yelled and used profanity in connection with taunting Safdar about leather patches on his jeans. *Id.* ¶¶ 132-33 (citing Ex. 3 at 142-48, 149-55). Maddox conceded that she had not witnessed some portion of these alleged incidents between Whittenburg and Safdar. *Id.* ¶ 144 (citing Ex. H at 79-80).

Defendants present a less offensive version of these incidents. In September 2007, Whittenburg expressed curiosity and asked Safdar if he could attend mosque with him. DSMF ¶¶ 126-27. Safdar initially agreed, but then changed his mind. *Id.* ¶ 129 (citing Ex. O at 64-65). Safdar complained to Corporation Counsel that the conversations made him feel uncomfortable. The matter was investigated by Jones and Foster. *Id.* ¶¶ 130-31.

Maddox was interviewed as a witness during Jones's investigation of the Safdar incident. *Id.* ¶¶ 135, 138; RSMF ¶ 135. Maddox appears at times to claim that she was the one who reported the incident to Jones, arousing Whittenburg's ire. In her deposition, however, she stated that Safdar reported the incident. Only thereafter did Jones call Maddox into his office and ask her questions about the incident, which she reluctantly answered. (Ex. 3, Maddox Dep. at 146-48; *see also* D'Anton Ex. H, Maddox Dep. at 82-83).[12] After the incident, Jones made "frequent inquiries" of Safdar to ensure that further problems did not occur.[13] *Id.* ¶ 137; RSMF ¶ 137.

---

[11]   Mazzula testified that Whittenburg and Safdar did not get along because Safdar thought Whittenburg discriminated against him because of his background.

[12]   Q: .... There was a complaint. Were you the one who went to Aney or Marquis or whoever it was and initiate it?
      A:      No. Saleem initiated his own issue.
    ....
    Q:      No, no. And then you were just called in as a witness?
    A:      Yes.

(D'Anton Ex. H, Maddox Dep. at 82-83)

[13]   Defendants also state that Safdar "reported more" to Jones than he did to Whittenburg, and that most of his instructions came from Jones. *Id.* ¶¶ 139, 140.

Maddox asserts that Whittenburg retaliated against her for speaking to Jones about the Safdar incident. Defendants note that Whittenburg gave her an "excellent" evaluation after it occurred, but Maddox disputes the timing. *Id.* ¶ 141; RSMF ¶ 141 (citing her deposition, Ex. 3). (Both the incident and the evaluation occurred in September 2007.) At her deposition, Maddox admitted that Chandy, at least, did not take any adverse action against her. *Id.* ¶ 142 (citing D'Anton Ex. H at 83-84).

Sometime after the Safdar incident, Maddox referred to Whittenburg as a "white bastard." DSMF ¶ 92; Ex. H at 649-50. Maddox testified that this was not a "racial statement" because she did not "say it in a racial way." Ex. H at 651-52.

Maddox asserts that Whittenburg acted in a discriminatory manner against other employees. She says that Whittenburg caused Assistant Corporation Counsel Andrea Mazzula to feel like a "sex object." RSMF ¶ 18 (citing Ex. 7, 11/5/2010 Mazzula Letter to New Jersey Department of Labor). Mazzula's letter stated that Whittenburg looked at her in a way that made her uncomfortable and that he "appeared" around the office where she was. Ex. 7. Maddox also asserts that an African-American female paralegal had believed Whittenburg was racist because he was sociable and had a "nice demeanor" with white people, but was standoffish with people of color. *Id.* (citing Ex. 8, Johnson Dep. at 27-28, 71-73). Finally, Maddox asserts that she was warned by Ayesha Freeman that Whittenburg did not respect people of color. *Id.* ¶¶ 19, 128 (citing Ex. 10, Maddox and Freeman Emails). Freeman's emails indicate that she remembers possibly warning Maddox about working with Whittenburg, but that she could not swear to any particular communications. As to her own experience, she stated that she did not "observe any instances of negative interaction with any women including women of color." Ex. 10. And Freeman has now submitted a certification essentially absolving Whittenburg. (ECF No. 62-8).

Maddox asserts that Whittenburg was disciplined at his former law firm for inappropriate comments or behavior to female employees. RSMF ¶ 145 (citing Ex. 5, Porzio Bromberg Records). Those records indicate that Whittenburg was admonished about his conduct at his prior firm's holiday party. Ex. 5.[14]

---

[14]   On November 24, 2010, Hon. Patty Shwartz (now a Judge of the U.S. Court of Appeals for the Third Circuit, but then the Magistrate Judge assigned to the case), ordered that the Porzio Bromberg records be produced "only for the purposes of this

Marquis Jones asserted that no complaints were lodged against Whittenburg by Law Department employees that involved allegations of discrimination. Any complaints against Whittenburg involved his supervisory style. *Id.* ¶ 153 (citing Jones Cert.).

Maddox, without any supporting evidence or testimony, asserts that Whittenburg or other Newark employees pilfered her F drive or mailing-return receipts. Defendants deny that there exists any evidence of such an incident. DSMF ¶ 36; RSMF ¶ 36.

### c. *Allegations Against the other Defendants*

Maddox's allegations of discrimination against the other Defendants all relate back to Whittenburg. Maddox, at her deposition, faulted them all because they acquiesced in "discriminatory actions by a white individual," meaning Whittenburg. DSMF ¶ 160 (citing Ex. H at 121-22). Defendants assert that Maddox has no evidence that the Defendants racially discriminated against her. *Id.* ¶ 162.

At her deposition, Maddox seemed to concede that she simply assumed at the time that there was racial bias against her:

> I believe based on everything that happened, that they would get me. So I don't know if it's unfounded, but based on what had happened, and maybe I'm using the term in a colloquial sense, and not necessarily a clinical sense, but based on what happened I believed that they would get me, and maybe I wasn't thinking rationally, highly unlikely, I know I probably was being a little irrational, but I was freaking out. I was nervous.

*Id.* ¶ 163 (citing Ex. H at 627). Maddox admits making that statement at her deposition, but asserts that she nevertheless presented sufficient evidence of retaliatory, if not racial, discrimination. RSMF ¶ 164.

### C. Procedural History

On August 10, 2010, Maddox filed a complaint in New Jersey state court alleging against Newark and the individual defendants various constitutional, statutory and common law causes of action. RSMF ¶ 158. Essentially, Maddox alleged that she was unlawfully terminated and that the Defendants engaged in discriminatory behavior.

---

litigation" and "for counsel and expert's eyes only." Order (ECF No. 12) at 1-2. Judge Shwartz did not rule on the admissibility of the records. *Id.*

The Defendants removed the case to this Court on September 29, 2010. (ECF No. 1). The case was originally assigned to Hon. Faith S. Hochberg. Defendants filed an Answer and Counterclaim on October 13, 2010. (ECF No. 3). The case was referred to mediation on October 21, 2010. (ECF No. 5). On June 29, 2011, while the mediation was pending, the case was reassigned to Hon. Claire C. Cecchi. (ECF No. 23). On March 20, 2012, the mediator reported that the mediation was unsuccessful. (ECF Entry dated 3/2/2012). Judge Cecchi referred the case to mediation again on June 26, 2012. (ECF No. 52).

On August 1, 2012, the case was reassigned to me. (ECF No. 54). On June 7, 2013, the Defendants moved for summary judgment. (ECF Nos. 61, 62). On August 8, 2013, after the motions were fully briefed, the mediator indicated that the case might return to mediation after the pending motions were decided. (ECF Entry dated 8/8/2013).

## III.   ANALYSIS

Before the Court are two motions for summary judgment: one on behalf of Defendant Whittenburg (ECF No. 61), and one on behalf of Newark, Neals, and Pereira (ECF No. 62).

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### B. Analysis of Maddox's Claims

Maddox's complaint contains seven counts: (1) retaliation under the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1; (2) breach of contract and implied covenant of good faith and fair dealing; (3) wrongful discharge pursuant to N.J.S.A. 34:15-39.1; (4) violations of 42 U.S.C. §§ 1983, 1985(3), and 1988; (5) common law wrongful discharge; (6) illegal dismissal or suspension under N.J.S.A. 40A:9-172(1) & (4); and (7) negligent hiring/retention. Compl. (ECF No. 1-1). Because I do not find that the record contains sufficient evidentiary support for any of Maddox's claims for relief, I will award summary judgment to the Defendants on all seven counts of the complaint.

### 1. Discrimination Claims under the LAD (Count 1)

In Count 1, Maddox alleges that she was retaliated against, subjected to a hostile work environment, and given disparate treatment, all in violation of the LAD. Compl. ¶ 19. Although these three related employment discrimination theories rest on a common set of facts, I consider them separately.

#### a. Retaliation

Maddox asserts that Defendants terminated her employment because she had reported Whittenburg's religious comments to Saleem Safdar, complained about her workload, and made a worker's compensation claim. Compl. ¶¶ 10-17. LAD retaliation claims follow the burden-shifting framework

established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff must first establish a prima facie case of discriminatory retaliation. To do so, Plaintiff must demonstrate that: (1) she engaged in a protected activity known by the employer; (2) she suffered an adverse employment action; and (3) her participation in the protected activity caused the retaliation. *Craig v. Suburban Cablevision, Inc.*, 660 A.2d 505, 508 (N.J. 1995). A LAD Plaintiff bears the burden of providing that her original complaint (*i.e.*, the protected activity that triggered the retaliation) was made reasonably and in good faith. *Carmona v. Resorts Int'l Hotel, Inc.*, 915 A.2d 518, 520 (N.J. 2007). An unreasonable, frivolous, bad-faith, or unfounded complaint is not a basis for retaliation liability under the LAD. *Id.* at 530.

Once the Plaintiff has met her initial burden, the defendants must articulate a legitimate, non-retaliatory reason for the adverse action. *Young v. Hobart West Group*, 897 A.2d 1063, 1072-73 (N.J. Super. Ct. App. Div. 2005). Then, "the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive." *Id.* at 1073 (internal quotation omitted).

### (1) Prima Facie Case of Retaliation

To state a prima facie case of discriminatory retaliation is not an onerous requirement, *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), but Maddox has fallen short here. She identifies three "protected activities" that allegedly triggered retaliation. She asserts that Defendants retaliated against her for complaining about her workload. *Id.* ¶ 13. She asserts that Defendants discriminated against her because she spoke of comments Whittenburg made to Saleem Safdar, a Muslim staff attorney. Compl. ¶ 10. And she asserts that Defendants retaliated against her because she made a workers' compensation claim. *Id.* ¶ 17.

Complaining about one's workload is not in itself a protected activity under the LAD's antidiscrimination provisions. *Young*, 897 A.2d at 1073. On the other hand, Maddox's complaint about the Whittenburg-Safdar incident and her worker's compensation claim could relate to practices made unlawful by the LAD: religious discrimination and disability discrimination.[15] *See id.*

---

[15]     As noted above, it would not be accurate to say that Maddox "reported" the Safdar incident. Maddox asserts in conclusory fashion that she did; Defendants assert that Safdar reported it himself. DSMF ¶¶ 130-31, 135 (citing Chandy Cert. ¶ 16); RSMF ¶ 133, 135. At oral argument, Maddox's attorney appeared to concede that

(citing N.J.S.A. 10:15-12d). The second prong of a prima facie LAD case, moreover, is not in dispute: Maddox's firing was an adverse employment action by any definition.

Maddox has failed, however, to set forth facts establishing a causal connection between the protected activity and her termination. A causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive. *Romano v. Brown & Williamson Tobacco Corp.*, 665 A.2d 1139, 1142 (N.J. Super. Ct. App. Div. 1995).

Thus, for example, causation may be found where "those exhibiting discriminatory animus influenced or participated in the decision to terminate." *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001) (Title VII and NJLAD case). There is no evidence here, however, that Whittenburg had any involvement in the termination decision. Nor is there any evidence that the higher-ups who made the decision, particularly Corporation Counsel Neals, harbored any discriminatory animus.

Maddox contends in the alternative that, because her termination occurred after protected activity, a causal connection may be inferred. *See* Opp. at 13-15. She points out that it was after she complained about the Safdar incident and her workload that Defendants "move[d] up" the review of her files, and that as a result of that review, she was terminated. *Id.* at 15-16.

It is true that causation may be inferred from temporal proximity: *i.e.*, protected conduct that is "closely followed" by the adverse action. *Id.* (citing *House v. Carter-Wallace*, 556 A.2d 353 (N.J. Super. Ct. App. Div.); *Bimbo v. Burdette Tomlin Mem. Hosp.*, 644 F. Supp. 1033 (D.N.J. 1986)). But temporal proximity, to raise an inference of discrimination on its own, must be "very close." *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The termination here did not "closely follow" the protected activity; it occurred 15 months later. *See Young*, 897 A.2d at 1073-74 (4 months between complaint and termination not "unusually suggestive" of causation or retaliation for

---

Safdar may have come forward himself, and that Maddox's "reporting" of the incident consisted of her being called upon as a reluctant witness. Maddox herself was very clear in her deposition that she was called in by Jones, who was already investigating the incident, and that she reluctantly answered questions. *See* D'Anton Ex. H, Maddox Dep. at 82-83; Maddox Ex. 3, Maddox Dep. at 146-150) Although the characterization is not dispositive, her portrayal of herself as a whistleblower has no support in the evidence.

purposes of summary judgment); *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 233 (3d Cir. 1989) (3 months not sufficient).

There is a strain of case law that suggests a somewhat broader conception of proximate causation. Thus, for example, in *Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011), the Court considered a claim that an employer fired an employee based on his military reserve obligations, in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). There, immediate supervisors took discriminatory disciplinary action based on their hostility to the employee's military service. A vice president then dismissed the employee on the basis of that disciplinary action, but the vice president was innocent of any antimilitary bias. The Court held "that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 1194.

This is sometimes known as a "subordinate bias" or "cat's paw"[16] theory of proximate causation. Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged"; it excludes "links that are too remote, purely contingent, or indirect." *Id.* at 1192. This Circuit has applied the *Staub* proximate cause analysis, at least in a general way, in the context of a Title VII employment discrimination claim. *See McKenna v. City of Philadelphia*, 649 F.3d 171 (3d Cir. 2011) (finding that an independent determination by higher-ups did not necessarily break the chain of causation where they adopted the evidence developed by the supervisor who discriminated).

Maddox's case, however, is a far cry from anything that has been recognized as a viable "cat's paw" theory. The cases ordinarily involve a disciplinary finding or report by a biased supervisor that furnished the basis for a superior's decision to dismiss or discipline the employee. But it is not alleged here that Whittenburg misled his superiors. Rather, he supposedly gave Maddox too much work. Her complaints of overwork led to a supervisory review of her files. That review uncovered multiple examples of substandard performance. That substandard performance, uncorrected after three months, led to her dismissal. This chain of events would not meet the standard of proximate cause.

---

[16]     When used as a term for an unwitting intermediary, the expression derives from the La Fontaine fable (possibly derived in turn from Aesop) of the wily monkey who persuaded the cat to pull his chestnuts out of the fire.

First, as to Maddox's complaints about Whittenburg, the evidence does not support an inference of retaliation. Whittenburg had no authority to terminate Maddox, and no involvement in the decision to terminate her. DSMF 97-98; RSMF 97. Maddox claims a less direct connection: *i.e.*, that Whittenburg piled on the work, and that the review of her files was accelerated as a result of the Whittenberg/Safdar affair. The Safdar incident, however, occurred in September 2007. DSMF ¶¶ 126-27. Defendants agreed to review Maddox's files six months later, after a March 2008 meeting among Maddox, Foster, Neals, and Torok—a meeting that Maddox herself requested to address her caseload. Ex. P, Foster Memo to File; DSMF ¶ 68. The file review itself commenced a full seven months later, at the end of October 2008. DSMF ¶ 69; Ex. Q, Email from Pereira to Maddox. And it was not until January 2009, after Maddox failed to correct problems discovered in the review, that she was terminated. The implication that the file review was a product of discrimination related to the Safdar incident is unsupportable. There is no suggestive temporal proximity to the Safdar incident, and Maddox cites no direct or circumstantial evidence of retaliation. In short, Maddox has not produced any evidence linking her alleged comments about the Safdar incident to the file review or to her termination.

Second, Maddox's workers' compensation claim does not support an inference of a retaliatory motive for her termination. Maddox was injured at work in December 2008. She asserts that she then gave Defendants "notice" that she was going to file a workers' compensation claim. Compl. ¶ 16. But she does not submit any direct evidence of a connection between such "notice" and the file review or the resulting termination. The record is devoid of any evidence, for example, that Defendants opposed her claim or that they took any action in response to receiving notice of it. Nor does the time line give rise to an indirect inference of retaliation. At the time Maddox was injured, the review of her files had already commenced. DSMF ¶ 69. And Maddox did not file her actual workers' compensation claim until March 2012, several years after she was terminated. She settled the claim in February 2013. *Id.* DSMF ¶¶ 105-06.

Third, the notion that the review of Maddox's files constituted "retaliation" for her complaints about her workload has no evidentiary foundation. A heavy workload as such invokes no aspect of antidiscrimination law. There is no direct evidence of retaliation, and Maddox offers no circumstantial evidence. At a March 2008 meeting, Maddox said her workload was too heavy. The City's response—a review of her workload—was the obvious, logical next step. All attorneys, moreover, were subject to such reviews. Maddox's file review was perhaps a *response* to her complaints about her

21

workload, but without further evidence it cannot be assumed to have constituted *retaliation* for such complaints.

Overall, the circumstances and timing of Maddox's complaints and her termination do not establish a causal connection. The mere fact that these events preceded her termination is insufficient to support an inference of a retaliatory motive. *El-Sioufi v. St. Peter's University Hosp.*, 887 A.2d 1170, 1189 (N.J. Super Ct. App. Div. 2005). Maddox has not proffered any additional evidence that any protected conduct was related to her termination. Therefore, her LAD retaliation claim must fail. *See House v. Carter-Wallace, Inc.*, 556 A.2d 353, 360 (N.J. Super. Ct. App. Div. 1989).

### (2) Pretext

As stated above, Maddox has not established a prima face case of retaliation. But even if she had, her LAD claim would nevertheless fail because she cannot show that the proffered reasons for her termination were pretextual. To demonstrate pretext, the employee must show that the employer's reasons for firing her were "weak, incoherent, implausible, or so inconsistent that 'a reasonable factfinder would rationally find them unworthy of credence.'" *Sarullo v. US Postal Service*, 352 F.3d 789, 800 (3d Cir. 2003) (Title VII) (*quoting Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997)). To prove pretext, "a plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent." *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1140 (N.J. 2005) (LAD case); *see also Viscik v. Fowler Equip. Co.*, 800 A.2d 826 (N.J. 2002) (LAD case). The employer is entitled to summary judgment if, after proffering a non-discriminatory reason for its decision, plaintiff cannot "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Zive*, 867 A.2d at 1144 (internal quotations omitted).

Defendants assert that Maddox, a staff attorney, was terminated for a variety of performance-based reasons, some of which may have been tantamount to professional malpractice. *See* Newark Def. Br. (ECF 62-1) at 28; DSMF ¶ 100. The record is replete with evidence of Maddox's substandard performance. For instance, documents establish that she did not timely file proofs of claim in bankruptcy matters, that she did not process checks from the bankruptcy court, and that she did not give notice to the court in proceedings where Newark was withdrawing its opposition. *See* Ex. N, Foster

Memo to File; Ex. T, Uncashed Checks. The unprocessed checks included ones that had lain undeposited since before Maddox's employment, but some dated from the period of her employment as well. *See* Ex. T; DSMF ¶¶ 101, 120-21. In addition, the record documents Maddox's attendance issues. *See* Ex. I, Pl. Time Sheets; Ex. K, Pl. Sick Leave Records. In short, Newark's claims are thoroughly documented: its claims of uncashed checks, for example, are supported by the checks themselves; its claims about attendance, by the attendance records; its claims about failures to file pleadings, by the case files.

Maddox's denials are conclusory; she has failed to offer any evidence contradicting the performance and attendance issues raised by Defendants. *See, e.g.,* RSMF ¶¶ 74, 75 (citing no evidence to dispute Defendants' assertions that Maddox failed to file proofs of claim in bankruptcy cases and responsive pleadings in foreclosure matters). To explain the performance issues, Maddox repeatedly asserts that she had an unfair caseload. *See* Opp. at 13-14. Maddox's assertions do not raise a genuine issue of material fact as to her employer's belief that she did not adequately manage her cases. Many lawyers have large caseloads. At issue here is not workload assignment but workplace *discrimination.* Maddox's argument that her absences were attributable to a chronic medical condition is contradicted by the few medical records she has submitted. *See* Ex. 15, Medical Records.

This Court does not sit to second-guess employment decisions, however wrongheaded, or to decide whether a lawyer had too many cases. The court must look past general contentions that a firing was unfair or unwise, and determine whether it was driven by a *prohibited* motive:

> While there may be factual disputes relating to the circumstances of [her] termination, Plaintiff's burden is to demonstrate that "[Defendant's] reasons were a pretext for *discrimination,* not a pretext for something else." *Scott v. Allied Waste Svcs. Of Bucks-Mont.,* 2010 U.S. Dist. LEXIS 136202, 2010 WL 5257463, at 4 (E.D. Pa. Dec. 23, 2010) (emphasis in original). [She] "must show more than that [Defendant's] decision to [demote her] was 'wrong or mistaken,' but must demonstrate that 'it was so plainly wrong that it cannot have been the employer's real reason.'" 2010 U.S. Dist. LEXIS 136202, [WL] at *5 (quoting *Baker v. United Def. Indus.,* 403 Fed. Appx. 751, 2010 U.S. App. LEXIS 25140, 2010 WL 4997648, at *4 (3d Cir. Dec. 8, 2010).

*Vasbinder v. Shinseki,* 2011 WL 1789989, at *24 (W.D. Pa. May 10, 2011). *See also Keller,* 130 F.3d at 1108 (en banc; ADEA case) ("a plaintiff cannot simply

show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent").

Although Maddox, with or without citations to the record, gainsays Defendants' documented case, none of those disputes are genuine or material to her claims of retaliation and discrimination. The evidence of record consistently supports Newark's proffered reasons for dismissal. Maddox disagrees with those reasons, but she has not offered any competent evidence that they were nonexistent or pretextual. There is no genuine issue of fact remaining for trial on Maddox's LAD retaliation claim.

### b. Hostile Work Environment

Maddox asserts that Defendants subjected her to a hostile work environment, in violation of the LAD. Compl. ¶ 19. That claim, too, rests primarily on the incident between Whittenburg and Safdar in September 2007. The incident was followed, she says, by Whittenburg's "failing to provide the necessary assistance to her and ... unfairly distributing the case load." *Id.* ¶ 13. She also claims that her flash drive and a number of mail-return receipts went missing—losses she attributes to Whittenburg, without any evidence. *Id.* In her responsive statement of facts, Maddox asserts, for the first time, that a co-employee, Ayesha Freeman, told her that Whittenburg did not respect minority employees and was friendlier with white employees. RSMF ¶ 128.

A hostile work environment claim follows the same burden-shifting analysis as other discrimination claims under the LAD: (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or that it was discriminatory in its application. *Dixon v. Rutgers, The State Univ. of N.J.*, 541 A.2d 1046, 1051 (N.J. 1988).

To establish a prima facie hostile work environment claim, the plaintiff employee must show that the conduct complained of would not have occurred but for the employee's membership in a protected class, and that the conduct was severe or pervasive enough to make a reasonable person believe that the conditions of employment were altered and the working environment was hostile or abusive. *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 453-54 (N.J. 1993); *Taylor v. Metzger*, 706 A.2d 685, 688-89 (N.J. 1998). To support a claim, the conduct must be sufficiently pervasive *or* severe. In some cases, a single

incident can trigger liability if the incident is severe enough. *Metzger*, 706 A.2d at 502. On that score, however, the court must remain mindful that the LAD is not a "general civility code .... [D]iscourtesy or rudeness should not be confused with racial harassment," and "a lack of racial sensitivity does not, alone, amount to actionable harassment." *Andel v. UBS/PaineWebber, Inc.*, 860 A.2d 945, 955 (N.J. Super. App. Div. 2004) (quoting *Heitzman v. Monmouth County*, 728 A.2d 297, 304 (N.J. Super. Ct. App. Div. 1999)). The court must consider the "totality of circumstances" to determine whether the conduct at issue is sufficiently extreme. *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (considering Title VII and LAD claim); *Metzger*, 706 A.2d at 501.

Maddox complains that she was given too much work, but the LAD does not protect against that; it is a law against *discrimination.* Maddox has not produced any evidence that case assignments were unfairly allocated on the basis of gender, race, religion, or any other prohibited basis. Nor does she produce evidence of other employees' workloads for purposes of comparison. Maddox does not cite actual patterns of work assignments to support her contention that Whittenburg assigned case work unequally, let alone on a discriminatory basis. In short, Maddox's generalized complaints about the size of her workload do not establish a hostile work environment.

Maddox cites a statement allegedly made by Ayesha Freeman to the effect that Whittenburg was more "friendly" with non-minorities and lacked "respect" for minority persons. RSMF ¶ 128. That alleged statement is a very general and conclusory opinion. It does not relate to work assignments, Maddox's or anyone else's. It possesses a weak, perhaps wholly inadequate, evidentiary foundation; it is Maddox's account of what Freeman said about Freeman's perception of Whittenburg's attitudes. Freeman—the alleged declarant—says she "might" have warned Maddox about Whittenburg, but denies any certain memory of such a statement and says she will not testify to it. (Maddox Ex. 10, Maddox and Freeman emails.) Now, Freeman has submitted a certification essentially undercutting her alleged oral statement to Maddox; that certification under penalty of perjury, not Maddox's memory of a hearsay statement, represents what Freeman would testify to if called as a witness.[17] At any rate, a plaintiff

---

[17]   Freeman's certification says, for example, the following:

7.   I always had a good relationship with Ivan Whittenburg.
8.   He was always respectful of me.
9.   I had no reason to not think that he was a nice guy.
10.   Ivan was never disrespectful to women of color to my knowledge.
11,   He is not a racist to my knowledge.

cannot establish that *she* suffered from a hostile work environment by saying that someone *told* her there was a hostile work environment.

The allegations regarding Whittenburg's comments and conduct towards attorney Safdar merit closer examination. The parties dispute the scope and tenor of that September 2007 confrontation. The record is clear, however, that Safdar complained about a conversation he had with Whittenburg concerning Safdar's Muslim faith.

In Defendants' version, Safdar reported that Whittenburg expressed curiosity about Safdar's religion, and asked to attend mosque with him. DSMF ¶¶ 126-28 (citing Ex. O, Whittenburg Dep. at 60-63). That was enough to make Safdar uneasy and he reported the conversation to Jones. Jones and Foster followed up with an investigation of the incident. DSMF ¶¶ 130-31; *see also* RSMF Ex. 9, Nance Dep. (confirming that Safdar reported the incident).

Maddox portrays the incident as more serious (although it does not appear that Maddox claims to have been present). She asserts that Whittenburg did not merely express curiosity, but insensitively or aggressively questioned Safdar about Ramadan. And at some point, she says, Whittenburg made reference to his visit to Jerusalem, and said that he would "blow the head off a Pakistani kid" if such a "kid" approached him in an aggressive manner. DSMF ¶ 128 (citing Ex. 3, Maddox deposition at 147-49).

Maddox states that she reported the Safdar incident to Marquis Jones. That appears to be an exaggeration. In her own deposition, Maddox merely says that Jones called her into his office and asked her questions about the incident, and that she reluctantly answered. *See* n.15, *supra*; RSMF ¶¶ 133, 135; Maddox Ex. 3 (Maddox Dep. at pp. 146-48).[18]

Maddox does not allege that Whittenburg directed any religion-based discriminatory comments or conduct at her; she relies solely on comments to Safdar. As a threshold matter, the LAD is not receptive to such claims of harassment-by-proxy. When comments are directed at persons other than the plaintiff, the necessary causation is lacking. *See Caver*, 420 F.3d at 263

---

12.   His behavior, at a foreclosure meeting before I retired, towards Saleem Safdar was not because he was a racist but maybe because he was getting a little power. He was going to succeed me as Section Chief.

Freeman Cert. ¶¶ 7-12 (Docket no. 62-8).

[18]   Neither party cites any affidavit or testimony of Safdar himself.

(plaintiff cannot show that comments made to others would not have been made but for *plaintiff*'s membership in a protected class). At most, such third-party comments would supplement or provide background to a viable claim. *See id.* (distinguishing New Jersey Supreme Court's decision in *Taylor*, 706 A.2d at 690, where epithet was directed at plaintiff).

Setting aside that no actual connection is alleged, there is hardly even a potential connection between this incident and Maddox's own protected religious status. Safdar, a Muslim, belongs to a protected religious class. It is not at all clear that Maddox herself belongs to that class.

Maddox has belatedly asserted that, although she is a practicing Christian, she had a Muslim upbringing. RSMF ¶ 8. Maddox failed to refer to her Muslim background in her deposition testimony or interrogatory responses. Whittenburg Reply Br. (ECF No. 72) at 2-3 (citing Ex. 1 at 382); City Def. Reply Br. at 4. Maddox first asserted that she was raised Muslim in response to this summary judgment motion, in a certification dated June 17, 2013. *Id.* For purposes of argument, I will assume that Maddox's belated discovery that she herself was offended is not a sham. But Maddox does not contend that anyone at the Corporation Counsel's office, including Whittenburg, knew of her Muslim upbringing or believed she was a Muslim. Maddox does not assert that, when she spoke to Defendants about the incident, she informed them of any personal connection to the incident or to the Muslim faith. *See* Opp. at 3; Ex. H at 149-52. And in any event her hostile work environment claim is defective as a matter of law as explained above.

Finally, this discrete incident does not rise, or sink, to the level of a "hostile environment." There is no "pattern." And although one sufficiently severe incident may suffice, a claim cannot be established by "epithets or comments which are 'merely offensive'"; a lack of "racial or ethnic sensitivity does not, alone, amount to actionable harassment." *Mandel*, 860 A.2d at 955. Thus, for example, the Third Circuit has upheld summary judgment rejecting the hostile work environment claim of a female federal agent who submitted evidence of a taunting emailed video of a female suspect being tasered; comments about her appearance in tight jeans; and disparate access to certain work assignments and facilities. *See Sala v. Hawk*, 481 F. App'x 729, 735 (3d Cir. 2012) (not precedential). Maddox's allegations of harassment—not directed at her—do not even rise to that inadequate level.

In sum, the record would not support a finding that the conduct was severe enough to render Maddox's work environment hostile or abusive. Maddox fails to assert a single derogatory statement or action that was directed

at herself. Maddox was not the target of Whittenburg's conduct towards Safdar and she did not claim to be personally affected by it when she discussed it with her supervisors. *See* Ex. H at 150-52. Her recent declaration that she was raised as a Muslim does not transform this fairly isolated incident into one severe enough to have altered the terms of her employment. And her workload, however heavy, has not been shown to be disproportionate, abusive, or a product of the Safdar incident.

### c. *Disparate Treatment*

Maddox also fails to establish a claim under the disparate treatment prong of the LAD. Compl. ¶ 19. Like other LAD claims, a disparate treatment claim employs the familiar tripartite burden-shifting methodology of *McDonnell Douglas. Mandel*, 860 A.2d at 956 (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

Disparate treatment is demonstrated when a member of "a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion." *Id.* at 956. Maddox asserts several examples of what she perceived as disparate treatment at the hands of Defendants. These assertions do not suffice to raise a genuine, material issue of fact for trial.

I pass over incidents already sufficiently discussed. In connection with this claim, however, Maddox adds that former Corporation Counsel Chandy stated or implied that Maddox would be promoted if the foreclosure project turned out to be a success. Compl. ¶ 4; RSMF ¶¶ 30-31. Even if this promise were in fact made and broken, it would not support a claim of disparate treatment. Maddox offers no evidence that any other employee was promoted over her or otherwise treated differently. Maddox asserts generally that her workload was heavier than that of other lawyers. RSMF ¶¶ 39-40. She does not point to a single specific instance of another lawyer in the department being given fewer, or better, assignments. Maddox claims that her complaints to management about her workload went unheeded. She does not, however, point to any evidence that other employees' complaints were heeded. And in fact, Maddox admits that Defendants did respond to her complaints by deciding to have Torok and Defendant Pereira review her case files. RSMF ¶ 66. Finally, even assuming *arguendo* that Maddox received disparate treatment, she has not produced a scintilla of evidence that any such disparity was based on an "impermissible criterion." *Mandel*, 860 A.2d at 956. There is no evidence in the record sufficient to raise a triable issue as to Maddox's disparate treatment claim.

In sum, Maddox has failed to establish a triable case of LAD discrimination under any of the three theories she asserts. Therefore, summary judgment on Count 1 will be granted in favor of the Defendants.

### 2. Breach of Contract (Count 2)

In Count 2, Maddox asserts a state-law breach of contract theory. She finds an implied covenant of good faith and fair dealing implicit in personnel policies and the like. Compl. ¶ 2. Maddox asserts that Defendants breached that duty by discriminatorily refusing to judge her on the basis of her ability and merit, by "failing and refusing to consider her long term record of employment service," and by violating company procedures regarding progressive discipline. *Id.* ¶ 3.

The covenant of good faith and fair dealing is not an implied contract, but rather an implied term *of a contract. E.g., Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997) (repeatedly stating that the covenant is one implied "*in* every contract") (emphasis added); *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 169-70 (3rd Cir. 2001) ("An implied covenant of good faith and fair dealing is present *in* all contracts governed by New Jersey law") (emphasis added). The relevant contract, says Maddox, is the collective bargaining agreement ("CBA"). DSMF ¶¶ 103, 104, 114, and Ex. Z (the CBA). But that gives rise to another problem.

Any contractual claim based on the CBA is preempted by Section 301 of the Labor Management Relations Act. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393-94 (1987). "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) (citations omitted). *Accord Ciferni v. Day & Zimmerman, Inc.*, 529 F. App'x 199, 202 (3d Cir. 2013) (not precedential; quoting *Allis-Chalmers*).

Nor is preemption limited to claims based on express contractual terms. Federal law preempts any claim of breach of the covenant of good faith and fair dealing that is an implied term of the CBA. *Allis-Chalmers*, 471 U.S. at 218 (reasoning that because the claim "not only derives from the contract, but is defined by the contractual obligation of good faith, any attempt to assess liability here inevitably will involve contract interpretation"); *Guerrero v. Hovensa*, 259 F. App'x 453, 458 (3d Cir. 2007) (not precedential) ("Guerrero's second claim is also completely preempted as it alleged that there was a

'violation of the implied contractual duty of good faith and fair dealing.' Whether there is an 'implied contractual duty,' will necessarily require an analysis of the terms of the CBA to determine if the contract as a whole obliges the employer to act with good faith and fair dealing."); *Martinez v. Anselmi & Decicco, Inc.*, 2009 WL 5206286, at *8 (D.N.J. Dec. 22, 2009) ("Thus, to the extent her breach of express contract or breach of the covenant and good faith and fair dealing claims are based on the CBA, they are preempted by the LMRA."); *Bergen Reg'l Med. Ctr., L.P. v. Health Prof'l & Allied Emples. Union,* 2005 WL 3216549, at *4 (D.N.J. Nov. 28, 2005) ("this and other courts have recognized complete preemption of claims under Section 301 based on the implied covenant of good faith and fair dealing that adhere to a collective bargaining agreement.")

Maddox's breach of contract claim is therefore preempted to the extent it arises from the CBA. To put it another way, her state law breach of contract claim is confined to legal rights that arise independent of the CBA.[19]

To lend content to her claim, Maddox looks to various Newark policies and procedures. Some of these, such as the alleged duty to evaluate fairly her "ability and merit," or her length of service, are clearly within the scope of the CBA. Job security based on length of tenure, employment at will, or consideration based on merit, are matters covered by the CBA. (CBA, DSMF Ex. Z, *passim.*) Such claims are preempted.

A potential claim extrinsic to the CBA might arise from the Division of Personnel Department of Administration Operating Policies and Procedures. That policy statement requires that Newark follow a remedial system of progressive discipline. (RSMF Exhibit 4.) Newark, she says, violated that policy when it terminated her without implementing the required progressive disciplinary steps. RSMF ¶ 104. That progressive discipline requirement, however, applies only to "employees with permanent status," Ex. 4, and it does not apply to an "unclassified employee," DSMF ¶ 109 (citing Ex. CC). Maddox does not cite any evidence that she enjoyed "permanent status." Nor does she submit anything in response to Defendants' evidence that all assistant corporation counsel served at the pleasure of the Corporation Counsel and were "unclassified" employees. *See* DSMF Exs. C, CC.

---

[19]   The Newark Defendants, at any rate, do not focus on preemption, but seem to argue that Maddox has failed to set forth evidence of breach of any contractual duty, whether inside or outside the CBA. Newark Def. Br. (ECF 62-1) at 30.

Because the record contains no evidence that the progressive discipline policy applies to Maddox, Maddox cannot rely on it as the source of a contractual duty arising outside of the CBA. Maddox's Count 2 contract claim must be denied as a matter of law.

### 3. Wrongful Discharge Under N.J.S.A. 34:15-39.1 (Count 3)

In Count 3, Maddox asserts a claim of wrongful discharge in retaliation for her workers' compensation claim. The New Jersey Workers' Compensation Act, N.J.S.A. 34:15-39.1, makes it unlawful for any employer to discharge or discriminate against an employee who claims or attempts to claim workers' compensation benefits. To establish a prima facie case of retaliatory discharge, the plaintiff must show "(1) that [s]he made or attempted to make a claim for workers' compensation; and (2) that [s]he was discharged in retaliation for making that claim." *Galante v. Sandoz, Inc.*, 470 A.2d 45, 47 (N.J. Super Ct. Law Div. 1983). *Galante* upheld summary judgment for the defendant employer where plaintiff failed to produce any evidence that the termination was retaliatory.

As discussed in the context of Maddox's LAD claim, the record contains no evidence connecting her termination to her workers' compensation claim. *See* p. 21, *supra*. This Count 3 wrongful discharge claim, which mirrors one component of the retaliation claim under the LAD, likewise fails as a matter of law.

### 4. Violations of 42 U.S.C. §§ 1983, 1985(3), 1988 (Count 4)

Although the allegations in Count 4 are not easily construed, Maddox appears to assert three federal and state constitutional claims. First, Maddox asserts that Defendants retaliated against her for making discrimination complaints, in violation of her First Amendment rights. Compl. Count 4 ¶ 3. Second, she asserts that Defendants deprived her of her property rights and violated her substantive due process rights under the Fourteenth Amendment. *Id.* Count 4 ¶ 4. Third, she asserts that Defendants violated her right to bring grievances under Art. 1, para. 19, of the New Jersey Constitution.[20] *Id.* Count 4 ¶ 3. Maddox also asserts a claim pursuant to 42 U.S.C. § 1985 for conspiracy

---

[20]     Maddox does not cite the N.J. Civil Rights Act, and awkwardly asserts this state constitutional claim under 42 U.S.C. § 1983.

to violate her constitutional rights, and a claim for attorneys' fees under 42 U.S.C. § 1988.[21] *Id.* Count 4 ¶ 4.

### a. First Amendment

Maddox asserts that Defendants violated her First Amendment rights when they retaliated against her for making complaints or reports of racial and religious discrimination. Compl. Count 4 ¶ 2. Specifically, Maddox asserts that Defendants decided to review Maddox's files ahead of schedule because she reported the Whittenburg/Safdar incident. Opp. at 28-29.

To succeed on a retaliation claim, a plaintiff must show (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising her constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action. *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003))). Where the plaintiff is a government employee, she must show that she spoke, not merely as an employee, but as a citizen, on a matter of public concern. *Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2493, 2500 (2011) (holding that this test applies in both speech clause and petition clause cases). If a public employee does not speak as a citizen, the First Amendment is not implicated by the employer's personnel decisions. *See id.* Here the adverse action alleged is dismissal, but an actual firing need not be shown, so long as the alleged retaliatory conduct would "deter a person of ordinary firmness from exercising her First Amendment rights." *Thomas*, 463 F.3d at 296 (citing *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)).

As previously discussed, the parties disagree as to a number of the facts surrounding the September 2007 Safdar incident. But even viewing the submitted proofs in the light most favorable to Maddox, *see Scott v. Harris*, 550 U.S. 372, 380 (2007), I find no factual issue for trial as to this First Amendment retaliation claim.

For purposes of this discussion, I will assume *arguendo* that Maddox established the first element of her claim, *i.e.,* that she engaged in protected conduct when she spoke to a supervisor on the subject of the Safdar incident. Such a statement might be construed as pertaining to a matter of public

---

[21]    Section 1988 does not provide an independent cause of action; it authorizes a plaintiff prevailing under Sections 1981, 1982, 1983, 1985, or 1986 to recover attorney and expert fees. *See* 42 U.S.C. § 1988.

concern. *See Lane v. Franks et al.,* 134 S.Ct. 2369, 2380 (2014) (Speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'").

Maddox has failed, however, to establish the second and third elements of the claim: that this report *caused* the action claimed to be retaliatory. *Thomas,* 463 F.3d at 296. That evidentiary deficiency is discussed in detail in the context of Maddox's parallel LAD retaliation claim. *See* Section III.B.1.a, *supra.* Maddox asserts that after she reported the incident, Defendant Neals "moved her up to the head of the class" for file review, and that she was terminated as a result of that review. Opp. at 28. This conflates two complaints Maddox made: her statement about the 2007 Safdar incident and her 2008 complaint that her workload was too heavy. It was only after Maddox complained that she had been given an unfair share of the files that Neals decided that her files should be reviewed. RSMF Ex. 1 at 94-97.[22] That review occurred in late October 2008. From that review, Defendants learned of performance issues that led or contributed to Maddox's termination in January 2009. DSMF ¶ 101.

Maddox points to no evidence of retaliation for reporting the 2007 incident. The incident and her dismissal occurred fifteen months apart, and Whittenburg was not involved in her dismissal. No evidence links the Safdar complaint to the alleged acceleration of the 2008 file review. No evidence links that alleged acceleration of the file review (as distinguished from what the file review revealed) to the termination.

Here, as elsewhere, Maddox disputes one fact or another, contends that shortcomings were not her fault, and generally argues that her firing was not justified. The wisdom or correctness of the employer's judgments, however, is not at issue; it is not, for example, "a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information." *Fogarty v. Bowles,* 121 F.3d 886, 890 (3d Cir. 1997) (quoting *Waters v. Churchill,* 511 U.S. 661, 679 (1889) (O'Connor, J., plurality opinion)). Because Maddox cannot establish that any unlawful retaliation

---

[22]     Contrary to Maddox's assertions, the deposition testimony of Defendant Neals does not support her contention that the review of her files was accelerated in retaliation for her "complaint" about the Whittenburg/Safdar incident. Opp. at 28. Neals testified that Maddox's file review was moved up in time because Maddox "complained" that her workload was too heavy. RSMF Ex. 1 at 94-97.

resulted from protected activity, her First Amendment claim fails as a matter of law.

### b. Fourteenth Amendment and New Jersey Constitutional Claims

The Complaint alleges that Defendants deprived Maddox of her property and substantive due process rights under the Fourteenth Amendment. Compl. Count 4 ¶ 4. Maddox also alleges a deprivation of her "right to grieve" under the New Jersey Constitution. *Id.* Count 4 ¶ 3. As to these claims, Maddox does not make any specific factual or legal arguments in her opposition brief. *See* Opp. at 26, 36. At any rate, she does not appear to allege any independent basis for relief based on these additional state and constitutional rights. They fail for the reasons expressed above.

### c. Conspiracy Pursuant to 42 U.S.C. § 1985(3)

Maddox alleges that Defendants conspired to violate her constitutional due process and property rights. Section 1985 potentially provides a cause of action for the victim of a conspiracy motivated by race or gender discrimination. *Farber v. City of Paterson*, 440 F.3d 131, 138 (3d Cir. 2006). To support a Section 1985 claim, the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) and resulting injury to person or property, or deprivation of any right or privilege of a citizen of the United States. *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983). The discriminatory animus required in the second element must be "class-based invidiously discriminatory animus," meaning that the purpose and effect of a violation is to prevent the victim from enjoying "equality of rights as contrasted with his and other citizens' rights." *Farber*, 440 F.3d at 135.

As discussed in more detail in the context of the employment discrimination claims, *supra,* the record would not support a finding of discrimination based on a factor such as gender, race, or religion. Maddox cannot point to any evidence that Defendants were motivated by, for example, animus against female or African-American employees. Nor has she demonstrated any disparate treatment vis-à-vis any other employee or group of employees.

Given the lack of evidence of class-based discriminatory animus, Maddox's conspiracy claim cannot succeed. Section 1985 was not intended as a "general federal tort law." *Farber*, 440 F.3d at 135 (quoting *Griffin et al. v. Breckenridge et al.*, 403 U.S. 88, 101-02 (1971)). There is no sufficient evidence of a relevant constitutional violation, and there is no evidence of a combination in support of such a violation, either. To put it another way, the deficiencies in Maddox's constitutional claims are not cured by the addition of a conspiracy count.

Maddox has failed to support her constitutional claims under Section 1983 and Section 1985 with evidence. Because no constitutional claim survives, Maddox cannot recover attorney or expert fees under Section 1988. Defendants will be granted summary judgment on Count 4.[23]

### 5. Wrongful Discharge (Count 5)

Maddox asserts an additional wrongful discharge claim in Count 5. No statutory authority is cited for this count. I assume Maddox intends to assert a common law claim. Because the LAD provides a remedy for wrongful discharge, a common law claim may be pursued only if it would protect an interest "in addition to or aside from those protected by the statutory action." *Dale v. Boy Scouts of America*, 734 A.2d 1196, 1219 (N.J. 1999), *rev'd on other grounds*, 530 U.S. 640 (2000) (internal quotations omitted); *Catalane v. Gilian Instrument Corp.*, 638 A.2d 1341, 1349 (N.J. Super. Ct. App. Div. 1341). Where the common law claim is merely duplicative, the plaintiff may not pursue it in addition to the LAD claim. *Id.* at 604-05.

Here, Maddox has not identified any interest independent of those protected by LAD. Nor do I see any. I must therefore construe her common law claim as being duplicative of her LAD claim, dismissed earlier. As discussed above, Maddox has not provided sufficient evidentiary support for any type of wrongful discharge claim. Count 5 fails as a matter of law.

---

[23]    Because I find that Maddox has not provided sufficient evidentiary support for her constitutional claims, I do not reach the Newark Defendants' qualified immunity argument, or the issue of the City's municipal liability for violations of Section 1983. *See* Newark Def. Br. at 51; *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978).

6. Illegal Suspension or Dismissal Under N.J.S.A. 40A:9-172 (Count 6)

Count 6 of the Complaint alleges that Maddox was illegally dismissed, in violation of N.J.S.A. 40A:9-172(1) and (4). As a result, she says, she became distraught and suffered "a loss of the prospective gain of employment and lost income, and benefits." Compl. Count 6 ¶¶ 1-3. Maddox does not separately discuss this count in her brief. At any rate, Section 40A:9-172 does not create a separate cause of action. It merely permits an employee to recover salary from the date of dismissal if her dismissal is otherwise found to be illegal. Because there is no finding of wrongful dismissal, the premise for such a recovery is lacking.

7. Negligent Hiring/Retention (Count 7)

In Count 7, Maddox asserts that Newark unlawfully hired and retained Defendant Whittenburg, who "either harassed and assaulted plaintiff and disregarded [her] complaints." Compl. Count 7 ¶¶ 1-2. Maddox asserts that Whittenburg was accused of harassing employees or subordinates at his prior firm, and that Newark's negligent hiring allowed him to continue to do so. *Id.* Maddox states that she suffered "severe economic losses" as a result of Newark's negligence. *Id.* Count 7 ¶ 3.

An employer is potentially liable to a third party whose injury was proximately caused by the employer's negligence in hiring or retaining an employee who is unfit for the job. *DiCosala v. Kay*, 450 A.2d 508, 514 (N.J. 1982). The cause of action has two elements: (1) that the employer knew or had reason to know of the "particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons," and (2) that through the employer's negligence, the employee's "incompetence, unfitness, or dangerous characteristics proximately caused the injury." *Id.* at 516. To be foreseeable, the injury must be within a general "zone of risk" created by the employee's conduct. *Id.* at 517.

Maddox contends that Newark should have known about Whittenburg's discipline by his former employer, the Porzio Bromberg law firm. Opp. at 40 (citing Ex. 5). She alleges that he was admonished, but not disciplined, regarding inappropriate comments to two female attorneys at a firm holiday party. If Newark had done its "due diligence," says Maddox, it would have discovered the incident in a background check. Opp. at 40-41.

36

Assuming any incident at Porzio Bromberg occurred, there is no evidence that Newark knew or should have known about it. The City did perform a background check before hiring Whittenburg. Newark had no access to confidential, internal Porzio Bromberg documents, and could only rely on the firm's recommendation. Chandy received a "highly positive" recommendation" from Vito Gagliardi, Esq., as well as from retired New Jersey Supreme Court Justice James H. Coleman, Jr. DSMF ¶¶ 145-46. *Cf. Lingar v. Live-in Companions, Inc.*, 692 A.2d 61, 65-66 (N.J. Super. Ct. App. Div. 1997) (finding triable issue where employer prior drug convictions were a matter of public record).

And even assuming that the incident occurred and that Newark could have learned about it, Maddox's claim fails the foreseeability test. A plaintiff must show that the person's prior conduct somehow foreshadowed the actual harm she suffered. *See DiCosala*, 450 A.2d at 416-17. Maddox does not assert that she (or anyone else) was sexually harassed by Whittenburg. She has failed to put forth any evidence that Whittenburg discriminated against her on any basis remotely related to the alleged incident at Porzio. In short, the conduct alleged by Maddox is not within the zone of risk of Whittenburg's alleged prior conduct.

In sum, Maddox has not introduced evidence that the City knew or should have known of Whittenburg's alleged unfitness (which remains unproven), and she also fails to link that alleged unfitness to her particular injury. There is no issue of material fact to be tried, and summary judgment will be granted in favor of the Defendants on Count 7.

## IV.   CONCLUSION

The Defendants have carried their burden under Fed. R. Civ. P. 56 of showing that there is no genuine dispute of material fact as to the causes of action alleged in the Complaint. Accordingly, summary judgment is appropriate on all counts and will be entered in favor of the Defendants.

An appropriate order will be entered in accordance with this Opinion.

Dated: September 26, 2014

**Hon. Kevin McNulty**
**United States District Judge**

37